IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PARIS FOODS CORP., et al.,

                          **Plaintiffs,**

     **v.**                                         **1:05-cv-610-WSD**

FORESITE FOODS, INC., HUGH
COLLINS, MAX B. COLLINS,
BENJAMIN T. COLLINS, TODD
COLLINS, BRADLEY H.
COLLINS, JOHN C. SANFORD,
JAY CLARK, and BART W. RAY,

                          **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Foresite Foods, Inc.

("Foresite"), Hugh Collins, Benjamin T. ("Todd") Collins, and Bradley H. Collins'

Motion for Summary Judgment ("Def. MSJ") [89], Defendant John Sanford's

Motion for Summary Judgment ("Sanford MSJ") [87], Defendants' Motion for

Leave to File Excess Pages [88], Plaintiffs' Cross-Motion for Summary Judgment

[102], and Defendant John Sanford's Motion to Strike Plaintiffs' Cross-Motion for

Summary Judgment ("Mot. to Strike") [112].

## I.   BACKGROUND

Plaintiffs Paris Foods, Inc. ("Paris Foods") and Dennis Sales LTD ("Dennis Sales") brought this action for damages against Defendants pursuant to the Perishable Agricultural Commodities Act of 1930, 7 U.S.C. § 499 et seq. ("PACA").  Plaintiffs seek to impose liability on Foresite under PACA based on Foresite's failure to pay Plaintiffs' invoices for produce it purchased.  Plaintiffs ask the Court to impose a statutory PACA trust on Foresite's assets.  Plaintiffs also argue that the individual defendants, all part owners of Foresite, are personally liable for breach of fiduciary duty in failing to maintain and protect the PACA trust.

### A.   Relationship with Paris Foods

In 2001, Foresite began purchasing produce from Paris Foods.  Foresite packaged the produce and sold it to retailers, such as grocery stores.  Foresite became one of Paris Foods' top five customers.

Paris Foods invoiced Foresite for its purchases, and in each invoice, stated the payment terms.  Paris Foods, based on Foresite's creditworthiness, initially assigned Foresite the payment term of "2%, net 11."  This term meant that payment

for produce was due within 11 days of delivery, but Foresite received a discount of 2% if it made payment within 10 days.  Paris Foods included this term on invoices it transmitted to Foresite.  Foresite never paid an invoice within 10 days consistently carried an outstanding indebtedness to Paris Foods.

Despite this course of dealing, in Fall 2002, Paris Foods assigned Foresite a more generous payment term–"net 30 days."  This payment arrangement required Foresite to pay for produce within 30, rather than 11, days of delivery.  Foresite began paying Paris Foods invoices in excess of 30 days and continued to carry an outstanding balance with Paris Foods.

In Spring 2003, Paris Foods' Controller, Alex Marks, informed Todd Collins, Foresite's President, by letter, that Foresite's outstanding balance had grown to $412,695.89.  The letter requested that Collins contact Marks to discuss new payment arrangements to pay the debt Foresite owed.  Marks and Collins subsequently held a telephone conference in which they discussed modifying Foresite's payment arrangements.  Marks told Collins that Paris Foods was changing Foresite's payment terms from "net 30 days" to "Order to Order."  Marks created this new term to allow Paris Foods to continue selling product to Foresite without allowing Foresite's large outstanding balance to increase.

-3-

Under the "Order to Order" arrangement, to receive newly-ordered produce Foresite had to pay Paris Foods the "equivalent value" of the new produce it received. That payment was then applied to the oldest, rather than the most current, invoice Foresite owed. The "Order to Order" payment term allowed Foresite to continue to receive produce from Paris Foods so long as it sent an amount equal to the invoice for new deliveries so that Paris Foods could apply it to its most aged Foresite receivables.

On June 6, 2003, Marks followed up the phone conversation with a letter confirming the new payment agreement and reiterating Paris Foods' payment expectations. On June 9, 2003, Collins emailed Marks and reconfirmed the agreement reached over the phone, notified Marks that Foresite intended to abide by the agreement, and told Marks that Foresite had begun operating under the new payment plan. Marks replied by email that Foresite had complied with the phone agreement "just fine" and thanked Collins.

Paris Foods placed the "Order to Order" language on all subsequent invoices sent to Foresite, and Foresite paid the invoices consistent with the "Order to Order" arrangement. Over the next 13 months, the parties operated under those terms, and Paris Foods sold to Foresite almost $2.5 million worth of produce. During the

period in which the "Order to Order" term was employed, the estimated time it took Foresite to pay new invoices was approximately 65 days.

Foresite continued to struggle financially, and it fell further and further behind on its obligation to Paris Foods.  In July 2004, Paris Foods refused to sell any more product to Foresite and demanded payment of all outstanding amounts owed.  In December 2004, Foresite ceased doing business.  On March 3, 2005, Paris Foods filed this action against Defendants for payment on Paris Foods invoices totaling $500,200.24.

B.      Relationship with Dennis Sales

Throughout 2003, Foresite also purchased produce from Plaintiff Dennis Sales, a full service broker of frozen foods and vegetables.  Foresite was a customer of Dennis Sales for a little more than a year and purchased over $469,000 worth of produce during the relationship.

In January and February 2004, Dennis Sales submitted three invoices to Foresite.  Foresite was unable to immediately pay the billed amounts, and in February 2004, Dennis Sales stopped selling produce to Foresite.

In Summer 2004, Ryan McLaughlin, Chief Operating Officer of Dennis

Sales, contacted Todd Collins regarding the outstanding invoices.  On August 27,

2004, McLaughlin emailed Collins, stating:

> [O]ne last effort to touch base with [Todd Collins] on the
> Dennis Sales past due invoices . . . Per our last
> conversation on August 10th, Foresite was supposed to
> have a payment plan in place for Dennis Sales no later
> that [sic] August 20th . . . . Dennis Sales must have an
> acceptable payment schedule and preferably a partial
> payment (as a show of good faith on your part) in hand
> by Noon on September 30, 2004.

(Def MSJ, at 11.)  Later that day, Collins responded by email:

> My apologies . . . We are working on a plan that will pay
> Dennis out of the three outstanding invoices . . . Brian
> Sadler or myself will call you on Monday.

(Id.)

On August 30, 2004, McLaughlin held a telephone conference with Collins

and Foresite employee Brad Sadler.  Collins proposed that Foresite pay Dennis

Sales $1,000 per month from September through the end of 2004, increasing the

payments in January 2005 and retiring the debt by December 2005.  In exchange,

Collins asked Dennis Sales to refrain from taking legal action to collect the

balances.  McLaughlin accepted the payment plan, told Collins that Dennis Sales

would not bring a PACA or other claim against Foresite, and requested immediate

payment and a confirmation letter.

On September 2, 2004, McLaughlin sent a detailed email to Collins and

Sadler confirming the agreement they reached by telephone on August 30 and

reiterating the details of their arrangement.  McLaughlin stated that Dennis Sales

expected Foresite to forward the first installment of $1,000 as soon as possible and

provide a written payment proposal to Dennis Sales no later than September 30,

2004.  McLaughlin also stated that he hoped Foresite would begin making

payments of $3,500 per month beginning in 2005.  He stated that he felt "much

better knowing that we have a tentative plan in place."  (Def. MSJ, at 12.)

On September 2, 2004, Foresite mailed a check for $1,000 to Dennis Sales.

On September 15, 2004, Foresite sent to McLaughlin a letter describing the

payment agreement reached with Dennis Sales:

> Thank you for taking the time to work with all of us here
> at Foresite through our current short-term liquidity
> issues.  As we discussed, Foresite is unable to fully pay
> our outstanding invoices with you at the present time.
> Instead, we can pay $1,000 on or before the 15th of each
> month towards those invoices for the remainder of the
> year.  Beginning with the January 15, 2005 payment, we
> intend to increase the monthly amount to $2,000.  This
> should allow us to fully repay our outstanding balance

> with you by the end of 2005 or sooner.  As you are
> aware, we have already paid to you our initial installment
> that is due for September.  We at Foresite certainly
> appreciate your willingness to accept such payments and
> to refrain from charging us interest or taking any other
> action on the invoiced amounts so long as the promised
> payments are timely made. . . .

(Def. MSJ, at 13.)  On October 7, 2004, and November 30, 2004, Foresite made its

second and third $1,000 payments to Dennis Sales.

On December 1, 2004, McLaughlin emailed Collins seeking information

regarding the proposed increase in Foresite's monthly payments, which was set to

begin in January 2005.  McLaughlin thanked Collins for the payments made so far.

He also stated:

> [C]ould you please email me a payment schedule for the
> 12 months of 2005.  The obvious calculation equals
> payments of approx. $3,720/month.  I am OK with
> uneven payments (as long as Foresite doesn't want [sic]
> until 12/31/2005 to pay 50%), however, I would like to
> know how Foresite plans on getting this balance
> gradually down to zero by 12/31/2005 per all of our
> agreement.

(Def. MSJ, at 14-15.)  In January 2005, Dennis Sales received two more $1,000

checks from Foresite.  Subsequently, Foresite was only able to pay an additional

total amount of $5,000 toward the Dennis Sales invoices, leaving a balance of $43,644.

On March 3, 2005, Paris Foods filed this action against Defendants under PACA, seeking to recover funds it alleged were held in a PACA trust.  On September 22, 2005, Dennis Sales filed its Complaint in Intervention to collect against Defendants under PACA the amounts it claims it is owed.[1]  On December 5, 2005, the parties filed a Preliminary Report and Discovery Schedule ("the Report"), and the Court entered an Order approving the schedule on December 16, 2005.  (Order Approving Report [65].)  The Report specified that any motions for summary judgment would be due within 20 days from the close of discovery. Discovery closed on August 1, 2006.

On August 21, 2006, Defendant John Sanford filed his Motion for Summary Judgment.  (Sanford MSJ [87].)   On August 21, 2006, Defendants Foresite, Hugh Collins, Todd Collins, and Bradley Collins ("the Collins Defendants") also filed their Motion for Summary Judgment.[2]  (Def. MSJ [89].)  On September 12, 2006,

---

[1]  A third Plaintiff, Cascade Fruit Marketing, Inc. ("Cascade"), also filed a Complaint in Intervention, but has since reached a settlement with Defendants.

[2]  Plaintiffs apparently did not serve the other three defendants named in this action.

Plaintiffs filed their Opposition to Defendants Motion for Summary Judgment and Cross-Motion for Summary Judgment.  On October 5, 2006, Defendant Sanford filed a Motion to Strike Plaintiffs' Cross-Motion as untimely.

## II.   DISCUSSION

A.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The Court must view all evidence in the light most favorable to the party

opposing the motion and must resolve all reasonable doubts in the non-movant's

favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555,

1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence,

and the drawing of inferences from the facts are the function of the jury . . . ."

Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must

not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d

at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party," summary judgment for the moving party is

proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).

     B.    Defendants' Motion for Summary Judgment

Defendants argue they are entitled to summary judgment on Plaintiffs'

claims because Plaintiffs waived their PACA rights and therefore cannot recover

under the statute.  "PACA regulates the sale of perishable agricultural commodities

to protect produce sellers from unscrupulous or insolvent dealers, brokers, and

commission merchants. "  Country Best v. Christopher Ranch, LLC, 361 F.3d 629,

631 (11th Cir. 2004).  "The Act also provides that in interstate transactions

involving agricultural commodities, those commodities or their proceeds 'shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.'" Id. (quoting 7 U.S.C. § 499e(c)(2)).

These PACA provisions produce "a non-segregated floating trust, which gives produce suppliers priority over banks or other creditors who may have perfected security interests in the inventory and receivables of an insolvent produce dealer." Id. (citing 7 C.F.R. § 46.46).  "Because PACA trusts are intended for the benefit of all unpaid suppliers, all beneficiaries to a trust share the same priority." Id. at 632.

Although PACA provides extraordinary protections for produce sellers, it also has strict eligibility requirements.  "A PACA supplier must be selling produce on a cash or short-term credit basis." Patterson Frozen Foods v. Crown Foods Int'l, 307 F.3d 666, 669 (7th Cir. 2002).  "[T]he unpaid supplier or seller loses the benefits of the trust protection unless it has given written notice of intent to preserve the benefits of the trust to the buyer and has filed such notice with the

Secretary of Agriculture" within the time prescribed by the statute.  In re: Lombardo Fruit and Produce Co., 12 F.3d 806, 809 (8th Cir. 1993) (quotations and citations omitted).  "[PACA] regulations require payment be made within ten days after the produce is accepted, but permit the parties to agree to a longer term provided that term is *no longer than thirty days*."  Id. (emphasis added) (quotations and citations omitted).  "PACA requires a written agreement be executed before the underlying transactions for produce take place."  Id.

Even if the seller and buyer originally agree to terms that fall within the PACA requirements, if they enter into a post-default agreement that extends the time for payment beyond the 30 day maximum, the seller is ineligible for PACA protection.  Id. (holding that "at the time trust protection is claimed, there must exist a valid written agreement complying with PACA's terms" and plaintiff waived its PACA rights because it later modified a PACA-conforming agreement in a way that did not comply with PACA); Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A., 362 F.3d 33, 45 (2nd Cir. 2003) (holding that PACA is "applicable to post-default as well as pre-transaction agreements" and noting "the result of a post-default agreement extending the payment period beyond thirty days is no different than that of a pre-transaction agreement doing the same: both are

inconsistent with the prompt-payment objective, which is fundamental to PACA");

Greg Orchards & Produce, Inc. v. Roncone, 180 F.3d 888, 892 (7th Cir. 1999)

(denying seller PACA protection where it entered into post-default forbearance

agreement and holding that "in order to qualify for PACA trust protection, a

supplier must be in compliance with PACA and its implementing regulations at the

time it seeks to enforce its trust rights," and it is insufficient "that an agreement

[only] complies with PACA at the time notice is given"); Overton Distribs. v.

Heritage Bank, 340 F.3d 361, 368 (6th Cir. 2003) (holding that because payments

originally complying with PACA were altered to allow payment as late as 40 days

after the date of acceptance, the supplier's payment term failed to preserve its trust

benefits under PACA).

Several courts have found that produce sellers, like Plaintiffs, waived their

PACA rights when they made agreements similar to the ones involved in this case.

In Lombardo, a seller sold produce to a dealer under an agreement that complied

with PACA.  12 F.3d at 809-10.  When the dealer was unable to make its

payments, the parties agreed in writing to extend the time for payment beyond the

30 day maximum.  When the dealer went bankrupt, the seller attempted to enforce

its PACA trust rights.  The Eighth Circuit unequivocally rejected the argument that

-14-

the forbearance agreement did not abrogate the supplier's PACA protection.  It held:  "[A]t the time trust protection is claimed, there must exist a valid written agreement complying with PACA's terms.  Though such an agreement once existed, it did not exist at the time trust protection was claimed, having been modified by the parties' subsequent written agreement in such a manner that it no longer complied with PACA."  Id. at 810.  Not only must a supplier be in compliance with PACA when it files its notice of intent to preserve PACA trust rights, the supplier must also be in compliance when it seeks to enforce those rights in court.

Patterson Frozen Foods v. Crown Foods Int'l, 307 F.3d 666 (7th Cir. 2002), is also persuasive.  In Patterson, the plaintiff produce wholesaler sold the defendant produce dealer $58,600 worth of frozen peas.  307 F.3d at 668.  All the plaintiff's invoices contained the statutory language that was necessary to maintain the plaintiff's PACA trust rights.  The defendant dealer failed to pay.  The parties negotiated a payment arrangement, and the defendant faxed to the plaintiff a proposed repayment plan providing for eight monthly payments plus interest on the outstanding balance the defendant owed.  The plaintiff faxed a reply agreeing to

the plan but changing the payment date and adjusting the interest.  The plaintiff's vice president of finance signed the fax.

The defendant made its first payment under the new plan, but its financial condition deteriorated, and it sent less than the amount agreed upon by the parties. Three days later, the plaintiff wrote a letter to the USDA, admitting that it entered into the agreement, but that, because the defendant failed to make its second payment, the agreement was now void.  The defendant made further proposals to work out a revised payment plan, which the plaintiff rejected.  The defendant subsequently ceased operations.  Id. at 669.

The Patterson plaintiff sued and asserted it was entitled to PACA protection. It argued that only a signed and executed formal written contract can abrogate a created PACA trust–not faxes and letters.  The Seventh Circuit disagreed.  The court held that "PACA rights are lost whenever the parties enter into a written agreement that satisfies the generally applicable Statute of Frauds.  Nothing in either PACA itself or the policies that lie behind it justifies the judicial creation of a rule that can be satisfied only by a formally executed document with the word 'CONTRACT' typed at the top."  Id. at 671.  The Seventh Circuit further reasoned that "a PACA trust can be created through letters, invoices, or anything else

-16-

reduced to writing with no requirement of formality.  We see no reason why modification of the trust should require more than its creation."  Id.  The Patterson court held that the plaintiff lost its PACA rights when it entered into the modified payment plan, and the faxes and letter to the USDA were sufficient to show such an agreement.

The Second Circuit, in American Banana, expanded the waiver rule developed in these cases to include oral agreements as well as written agreements which extend credit beyond 30 days.  362 F.3d 33.  The American Banana court held that the seller's oral agreement to a debt repayment plan, which would allow the buyer to pay down his debt over time while continuing to buy and sell produce, waived the seller's trust rights under PACA because it allowed payments to be made in excess of 30 days.  Id. at 47.

The court reasoned that "nothing in the text of PACA or in its regulations . . . requires that a provable post-default agreement extending a payment period beyond thirty days must, without exception, be reduced to writing before it will disqualify a seller from PACA's trust protection. . . .[W]e cannot interpret this regulation to mean that parties are free to enter into agreements that

violate PACA's prompt payment rules as long as they do not reduce their agreements to writing." Id. at 46.

Like the plaintiffs in Lombardo, Patterson, and American Banana, Plaintiffs in this case abrogated their PACA trust rights by agreeing with Foresite, both orally and in writing, to allow payment terms in excess of the 30 day maximum prescribed by PACA. Plaintiffs do not have viable claims against Defendants under PACA, and summary judgment is appropriate.

> 1.    *"Order to Order" Agreement with Paris Foods*

Paris Foods' "Order to Order" payment agreement waived its PACA rights against Foresite. The term required Foresite to pay Paris Foods for the "equivalent value" of any new order it made when Foresite received delivery. Paris Foods applied this payment to Foresite's outstanding balance–not to the current delivery. Under the "Order to Order" term, Foresite was not required to pay on a new invoice within 30 days or within any specific time frame. In fact, it took Foresite an average of 65 days to pay its new invoices under the "Order to Order" payment term.

Foresite's President, Mr. Collins, agreed to the payment arrangement in a telephone conference, and the agreement was twice confirmed in writing. Paris

Foods then included the "Order to Order" term on its invoices, and the parties operated under the agreement for approximately thirteen months.  The payment arrangement extended Foresite's payment obligation beyond the 30 day maximum allowable under PACA, and thus Paris Foods relinquished its enforcement rights under PACA.

        2.     *Dennis Sales and Foresite's Payment Plan*

Similarly, by agreeing to a post-default payment plan allowing Foresite to pay its invoices later than 30 days after delivery, Dennis Sales also waived its PACA trust rights.  When Foresite failed to pay its outstanding invoices on time, McLaughlin and Collins agreed to a payment plan.  Under the plan, Foresite would pay the outstanding balance on the three invoices through monthly payments.  The payments initially were $1,000 per month until the end of 2004, when they were scheduled to increase during 2005 until Foresite repaid the entire debt.

Dennis Sales and Foresite confirmed the payment plan through telephone conversations between McLaughlin and Collins.  The parties also confirmed their agreement in writings dated September 2, 2004 and September 15, 2004.  Foresite made five payments under the new negotiated arrangement until it was no longer

able to do so.  Because the plan extended the payment term beyond the maximum allowable under PACA, Dennis Sales waived its right to PACA protection.

Plaintiffs do not deny that the parties made these oral agreements, nor do they deny the existence of the emails and letters relied upon by Defendants. Instead, they argue that the record displays "Collins' erstwhile attempts to manufacture . . . an agreement with Paris through fallacious letter confirmations and surreptitious notations of check stubs during the Fall of 2004, but each one of those machinations was caught by Paris' vigilant staff and rejected."  (Opp. to Def. MSJ [100], at 9.)  Plaintiffs, however, do not point to any evidence indicating that Paris Foods did not enter into the agreements or that the conversations, emails and letters relied upon by Defendants are not authentic.  Plaintiffs fail to demonstrate these agreements were not reached, or that Defendants' evidence of them is unreliable.

Plaintiffs also rely on In re Cafeteria Operators, L.P., 2005 Bankr. LEXIS 2483 (Bank. N.D. Tex. 2005), arguing that the emails in this case do not abrogate Plaintiffs' PACA rights because they occurred after the parties entered into transactions that originally complied with PACA.  In re Cafeteria Operators, besides being a non-binding bankruptcy case outside the Eleventh Circuit, does not

-20-

support Plaintiffs' argument.  In this bankruptcy case, the court declined to

address, because it was unnecessary to do so, whether post-default transactions

relating to the payment of a PACA claim on any terms beyond thirty days from

delivery precludes a supplier from asserting its PACA rights.

The changes Plaintiffs made in their payment terms with Foresite were

commercially practical and may well have, at the time, offered them the greatest

opportunity to be paid the amounts that Foresite owed to them.  In electing to enter

into these new payment arrangements, however, Plaintiffs waived their rights

under PACA.  The law simply is clear that a seller originally doing business under

terms covered by PACA may waive its PACA protection by agreeing to payment

terms outside the PACA statute.  The evidence here is that Plaintiffs extended their

payment terms with Foresite beyond the 30 day maximum required under PACA.

Both Plaintiffs waived their right to bring claims under PACA, and no reasonable

factfinder could find otherwise.  Summary judgment is required to be granted on

all of Plaintiffs' claims.[3]

---

[3]  Even if Plaintiffs did not waive their PACA rights, they would be unable
to recover against Defendants Sanford, Hugh Collins or Bradley Collins.  All
individual defendants, except for Todd Collins, argue they are not personally liable
for the unpaid invoices because they did not exercise control over Foresite's PACA
assets.  Plaintiffs essentially advocate strict liability for Defendants as shareholders

C.     Plaintiffs' Cross-Motion for Summary Judgment

Plaintiffs also filed a Cross-Motion for Summary Judgment against

Defendants, arguing that the evidence shows they are entitled to funds from the

PACA trust.  Plaintiffs may not bring claims under PACA because they agreed to

_____

of Foresite, without regard to whether they actually were in a position to control the PACA assets.  Plaintiffs argue that "[o]fficers and directors who own more [than] 10% of a licensee's stock and operating in the interstate produce business are not allowed to be passive; they are required to either exercise their ability to assert control and make sure the corporation fulfils its duties, or turn in their stock and resign."  (Opp. to MSJ [100], at 15.)  This is not the correct standard for holding an officer or director personally liable under PACA.  Although neither the Supreme Court nor the Eleventh Circuit has ruled on the issue, this Court in Weis-Buy Servs., Inc. v. John Manning Co., Inc., adopted the approaches of the Ninth Circuit in Sunkist Growers. Inc. v. Fisher, 104 F.3d 280 (9th Cir. 1997) and the Fifth Circuit in Golman-Hayden Co., Inc. v. Fresh Source Produce Inc., 217 F.3d 348 (5th Cir . 2000), which hold that it is permissible to impose personal liability on individual shareholders, officers or directors of a corporation *who are in a position to control PACA trust assets and who breach their duty to preserve those assets*.  See Weis-Buy Servs., Inc. v. John Manning Co., Inc., No. 1:02-CV-2039-TWT (Dec. 12, 2003).  In this case, Defendants put forth evidence that Hugh Collins simply invested in his son's business and had no operational or financial control of the company.  Similarly, Defendants Sanford and Bradley Collins put forth evidence that their duties were solely in sales.  Plaintiffs do not attempt to address each Defendant separately or argue that they were in a position to control Foresite's PACA trust assets.  In any event, because Plaintiffs waived their rights under PACA, they may not assert a claim for personal liability against any defendant.

terms which placed them outside the protections of PACA.  Plaintiffs' Cross-Motion for Summary Judgment must be denied.[4]

## III.   CONCLUSION

Accordingly,

Defendants Motion for Summary Judgment [89] is **GRANTED**, Defendant Sanford's Motion for Summary Judgment [87] is **GRANTED**, Defendants' Motion for Leave to File Excess Pages [88] is **GRANTED**, Plaintiffs' Cross-Motion for Summary Judgment [102] is **DENIED**, and Defendant Sanford's Motion to Strike Plaintiffs' Cross-Motion for Summary Judgment [112] is **DENIED**.

**SO ORDERED** this 20th day of February, 2007.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[4]  The Court also notes Plaintiffs' motion was filed almost three weeks late, and for that reason the Court could have declined to consider Plaintiffs' motion. L.R. 56.1(D) ("Motions for summary shall be filed . . . not later than twenty (20) days after the close of discovery.")